# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

MARY ELIZABETH SCHIPKE,
    *Plaintiff*,

v.

STATE OF CONNECTICUT, *et al.*,
    *Defendants*.

No. 3:17-cv-02087 (JAM)

## ORDER GRANTING MOTIONS TO DISMISS

Plaintiff Mary Elizabeth Schipke filed a *pro se* complaint against sixteen defendants, including the State of Connecticut; the City of Meriden, Connecticut; the Meriden Police Department; Meriden Police Officers Fonda, Busa, Pellegrini, and Zurstadt; Meriden Police Chief Jeffry Cossette; attorney Tom Luby; Suzanne Daigle, a Meriden Probate Court-appointed conservator over Mary Schipke's Aunt Rose; Connie Schipke, Mary Schipke's cousin; Meriden Probate Court Judge Brian Mahon; David Vega, who occupies the house that is the subject of this lawsuit; York Correctional Institution; the United States; and Our Lady of Mt. Carmel Church in Meriden.

On September 26, 2018, I granted the Church's motion to dismiss. *See* Doc. #92. I now turn to the remaining defendants' motions to do the same under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). While Schipke has alleged facts that, if true, speak to a number of tragedies surrounding her life and her family, none give rise to a plausible claim for relief at this time, and I will accordingly grant the remaining motions to dismiss.

## BACKGROUND

Schipke has filed a discursive complaint that highlights a great deal of personal misfortune. As best I can tell, she has alleged a series of wrongs principally connected to what

Schipke claims to be her "Ancestral Family Property" on Goodwill Avenue in Meriden, Connecticut ("the Goodwill Avenue home"). *See, e.g.*, Doc. #1 at 2. I take the following allegations of fact as true for purposes of this ruling.

In 1905, Schipke's great-grandmother, Rosalie Schilke, purchased a home at 129 Goodwill Avenue in Meriden. Doc. #1 at 8; Doc. #1-1 at 1. In 1921, she deeded the property to Schipke's grandmother, Martha Schipke, and her heirs. Doc. #1 at 9; Doc. #1-1 at 2. Schipke's Aunt Rose lived at the property with her Uncle Andrew Schipke, Doc. #1 at 3, 9, from roughly 1923 to Andrew's death in 2014, and Rose's death in 2016, *id.* at 23 n.29. Schipke's mother, Marguerite, spent some of this time serving in the United States Navy. *See id.* at 11; Doc. #1-1 at 4. In 1945, Marguerite took part in naval chemical warfare training in Virginia, where she was exposed to multiple toxic substances. Doc. #1 at 11. She developed several medical symptoms from the exposure, and died in Tucson, Arizona, in 1968. *Ibid.* Following her death, Marguerite's name was misspelled as "Marquerite" on the Meriden Veterans Memorial Boulevard Wall of Honor. *Id.* at 28.

Schipke's life has come with difficulties of its own. For instance, the effects of chemical warfare training on her mother have been passed on to her in the form of numerous disabilities, *id.* at 12, her family disowned her after Marguerite's death, *id.* at 31–32, she suffered from cancer from a botched medical procedure at age 15, *id.* at 26, and she now experiences post-traumatic stress disorder, *id.* at 28. Schipke learned about her Uncle Andrew's death in 2014, *id.* at 19, and traveled to Meriden from Arizona to claim the Goodwill Avenue home and care for her Aunt Rose, *id.* at 2, 19–20. Schipke arrived in Meriden on Thanksgiving of that year. *Id.* at 19. Rose left Schipke waiting at the door to the house, and when Schipke called the Meriden

police and medics, they told Schipke to leave the property. *Id.* at 20. Schipke alleges that since that time, the Meriden police have harassed her. *Ibid.*

Although Schipke does not detail what took place between November 2014 and November 2016, she does allege that on November 23, 2016, she was forcefully evicted from the Goodwill Avenue home. Doc. #1 at 16. Meriden police entered the property and "brutalized" her on the same day, *id.* at 21, 33, presumably in connection with the eviction. *Id.* at 32–33. Because the police failed to listen to her request to accommodate her disabilities, Schipke suffered a broken back, fractured sternum, and other injuries. *Ibid.* She does not, however, name any particular officers in connection with the arrest.

Schipke remained in custody from November 23 to December 19, 2016. *Id.* at 24. During that time, York Correctional Institution ("York") also refused to accommodate her disabilities, *id.* at 32, and she suffered pain, sleep deprivation, hunger, and lack of medical care. *Id.* at 24–25. As a result of her time in custody, she now suffers from several back injuries and emotional distress. *Id.* at 25. After her release, the Meriden Police Department ignored the civilian complaint she filed later that month, *id.* at 21, and the FBI similarly failed to act on her complaints about the Meriden police, *id.* at 4, 21.

Schipke appears to claim that there are ongoing state court proceedings against her with a trial date set for 2020. *Id.* at 24. Apparently in connection with those proceedings, she alleges that Judge Moore, who she does not name as a defendant, created numerous difficulties for her in posting bond. *Id.* at 35. After her friend Kevin Long finally did so, York intimidated Long into revoking it. *Ibid.* Schipke also alleges that even since her release the State of Connecticut has further immiserated her, principally through allocating insufficient food stamp benefits under the law. *Id.* at 12.

Schipke further alleges that several defendants have engaged in ongoing malfeasance surrounding both Aunt Rose and the Goodwill Avenue home. Schipke claims that Meriden Probate Court Judge Brian Mahon and Suzanne Daigle, Rose's court-appointed conservator, took part in a long-running embezzlement scheme against Rose, Uncle Andrew, and Schipke's grandmother Martha. *Id.* at 9–10. Schipke also alleges that attorney Tom Luby exercised undue influence against Rose as part of an "Inheritance Hijacking Fraud Scheme" in concert with her cousin Connie Schipke, and that Luby sold the Goodwill Avenue home to David Vega, who now lives there. *Id.* at 14–16.

Schipke finally appears to assert a claim for a violation of the Fifth Amendment's Takings Clause, as applied to the States through the Fourteenth Amendment. *Id.* at 10. Schipke does not, however, name any particular defendant in connection with her Fifth and Fourteenth Amendment takings claims aside from generic allegations about "the government" and defendants "acting under color of state law." *Ibid.*

## DISCUSSION

For purposes of a motion to dismiss for failure to state a claim, the Court must accept as true all factual matters alleged in a complaint, although a complaint may not survive unless the facts it recites are enough to state plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014). This "plausibility" requirement is "not akin to a probability requirement," but it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Because the focus must be on what facts a complaint alleges, a court is "not bound to accept as true a legal conclusion couched as a factual allegation" or "to accept as true allegations that are wholly conclusory." *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014). Similarly, because federal courts

have limited jurisdiction, a complaint in federal court must also allege facts that give rise to plausible grounds for a court to conclude that it has federal jurisdiction. *See Lapaglia v. Transamerica Cas. Ins. Co.*, 155 F. Supp. 3d 153, 155 (D. Conn. 2016). The Court liberally construes the pleadings of a *pro se* party in a non-technical manner to raise the strongest arguments that they suggest. *See, e.g.*, *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 157 (2d Cir. 2017) (*per curiam*). Still, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

### *Claims against the United States*

I will dismiss the claims against the United States. The United States is immune from lawsuits except when it consents to being sued, and the scope of that consent defines any court's jurisdiction over suits against the federal government. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing *United States v. Mitchell*, 445 U.S. 535, 538 (1980)).

Schipke's first set of allegations against the United States claim Marguerite's naval training caused her death—which interfered with Schipke's inheritance—and that Marguerite's chemical exposure also poisoned Schipke herself. Doc. #1 at 10–12. This appears to be a claim under the Federal Tort Claims Act (FTCA). Under the FTCA, the United States waives its immunity from many lawsuits for injuries resulting from its employees' careless or wrongful acts. 28 U.S.C. § 2674. But this waiver is limited, and the federal government is immune from liability for injuries to members of the military when those "injuries arise out of or are in the course of activity incident to service." *Feres v. United States*, 340 U.S. 135, 146 (1950). A court analyzes several factors when determining whether an injury occurred incident to service. These include the servicemember's military status, how the alleged tort relates to the servicemember's

5

membership, and the broad rationales underlying the *Feres* doctrine, including, *inter alia*, the need to preserve military decision-making from judicial interference. *See Wake v. United States*, 89 F.3d 53, 57–58 (2d Cir. 1996). As applied to Marguerite, this analysis is straightforward. Marguerite was a Lieutenant in the Navy, following military orders, aboard a naval ship, and taking part in a naval training exercise when the Navy allegedly exposed her to toxic chemicals. Doc. #1 at 11; Doc. #1-1 at 4–5. Marguerite's injuries were tightly related to that chemical exposure, and a suit arising from her injuries "would undoubtedly implicate military judgments concerning the training and supervision of military personnel." *Wake*, 89 F.3d at 62.

Of course, in this lawsuit, Schipke is the plaintiff, rather than Marguerite. But that doesn't matter here. Because of the need to protect the military's discretion as part of the executive branch, the *Feres* doctrine looks to the "cause of injury rather than to the character of a claimant." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 201, 202 (2d Cir. 1987) (barring derivative claims and collecting cases). Accordingly, the *Feres* doctrine is just as much of a barrier to a family member's claim arising from a *Feres*-barred injury as it is a servicemember's. *See Matthew v. United States*, 311 F. App'x 409, 412–413 (2d Cir. 2009) (citing *Agent Orange*, 818 F.2d at 203) (holding claim of daughter for father's chemical exposure and claim of mother for daughter's medical expenses to be *Feres*-barred). To the extent Schipke's claims arise from her own injuries and financial losses resulting from her mother's chemical exposure in the Navy, they are plainly barred by the *Feres* doctrine and outside this Court's jurisdiction. I will therefore dismiss them.

None of Schipke's other allegations against the United States state a plausible claim for relief. Although she alleges that Marguerite's name was incorrectly spelled on the Wall of Honor, she appears to primarily attribute the misspelling to the City of Meriden and only alleges

6

the United States' involvement through failing to oversee the proper labeling of grave markers. Doc. #1 at 27–28 & n.34. However, as Schipke also pleads, Marguerite is buried in St. Boniface Cemetery in Meriden, *id.* at 9, and consequently the Wall of Honor is not a grave site that the United States allegedly must supervise. No tort action can lie against a defendant based on events for which that defendant bears no responsibility. Similarly, to the extent that Schipke means to allege that the FBI violated her rights through not acting against the Meriden Police Department, *see id.* at 4, 21, she has no standing to do so. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."). Accordingly, I will dismiss all claims against the United States in this case.

### *Claims against Connecticut state defendants*

Schipke makes numerous allegations against the State of Connecticut and York throughout the complaint. I will dismiss all the § 1983 claims against both defendants, because neither of them are persons subject to suit under § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

Schipke also appears to claim that Connecticut and York have violated her rights under the Americans with Disabilities Act (ADA). *See* Doc. #1 at 13, 24–25, 32. A plaintiff may sometimes bring a Title II ADA claim against a State in its official capacity for monetary damages. *See Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 112 (2d Cir. 2001). But while someone with a disability may base a discrimination claim on the government's failure to make a reasonable accommodation, *see Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009), "[t]o prevail on a reasonable accommodation claim, [the plaintiff] must first provide the governmental entity an opportunity to accommodate them through the entity's established procedures used to

7

adjust the neutral policy in question." *Tsombanidis v. W. Haven Fire Dep't.*, 352 F.3d 565, 578 (2d Cir. 2003), *superseded by regulation on other grounds*, *Mhany Mgt., Inc. v. Cty. of Nassau*, 819 F.3d 581 (2d Cir. 2016). Schipke makes a vague claim that Connecticut must house her, Doc. #1 at 13, and that York denied her right to reasonable accommodations and injured her by choosing to "deny, force-drug, and brutalize" her instead. *Id.* at 24–25, 32. She does not allege that at any point she provided Connecticut or York with an opportunity to accommodate her, and as such, does not state sufficient facts to support a plausible claim for relief under the ADA. Consequently, I will dismiss those claims against Connecticut and York as well.

In addition to the claims against the Connecticut state entities, I will also dismiss the claims against Meriden Probate Court Judge Brian Mahon. Schipke's claims against Judge Mahon amount to a vague allegation of embezzlement and the probate court's participation in an "inheritance-hijacking" scheme, Doc. #1 at 9, 20–21. Schipike's only concrete factual allegation is that Judge Mahon told Schipke that her claim fell outside his court's jurisdiction. *Id.* at 21, 29. Schipke's claims are meritless. "It is well settled that judges generally have absolute immunity from suits for money damages for their judicial actions," *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009), such as the actions that Schipke alleges Judge Mahon undertook here. This doctrine even applies to a plaintiff's allegations that a judge acted maliciously or in bad faith. *Ibid.* Furthermore, any claim for injunctive relief against Judge Mahon is also barred, because § 1983 limits injunctive relief against judges in their judicial capacity only to cases where a declaratory decree was violated or declaratory relief was unavailable. *Ibid.* Schipke makes no such allegation, so I will dismiss her claims against Judge Mahon.

To the extent that Schipke means to assert other claims against the Connecticut state defendants, including, possibly, a taking of the Goodwill Avenue home, *see* Doc. #1 at 10, the

8

complaint is sufficiently vague and ambiguous as to disguise the nature of Schipke's claims, and thus does not give the defendants fair notice of the allegations against them. *See Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Accordingly, I will dismiss such claims without prejudice to Schipke's ability to file an amended complaint consistent with the instructions at the Conclusion of this order.

### *Federal claims against Meriden defendants*

Schipke alleges that she suffered from multiple acts of wrongdoing at the hands of various people and entities associated with the City of Meriden, including the city itself, the Meriden Police Department, Chief Cossette, and Officers Fonda, Busa, Pellegrini, and Zurstadt ("the Meriden defendants"). She has sued all these defendants under 42 U.S.C. § 1983, and as a preliminary matter, I will dismiss all claims against the Meriden Police Department because it is not a "person" who can be sued within the meaning of the statute. *See Conquistador v. Hartford Police Dep't*, 2017 WL 969264, at *2 (D. Conn. 2017).

As best I can tell, Schipke means to assert a false arrest claim based on her interactions with the police on November 23, 2016, *id.* at 24, 34–35; a claim, construed liberally, against the police for malicious prosecution, *id.* at 30; numerous claims against the city, police department, and individual officers for "inheritance hijacking" and property theft that she labels Fifth Amendment violations, *id.* at 30–31; a claim that police officers violated her rights under the ADA, *id.* at 32–33; and a claim that police officers trespassed on the property at Goodwill Avenue and exercised excessive force against her, *id.* at 33–34. Her allegations do not support a plausible claim for relief on any of these grounds.

First, any claim in Connecticut for malicious prosecution or false arrest requires that the charges stemming from the alleged malicious prosecution or false arrest terminate in the

9

plaintiff's favor. *Spak v. Phillips*, 857 F.3d 458, 461 & n.1 (2d Cir. 2017) (malicious prosecution); *Miles v. City of Hartford*, 445 F. App'x 379, 383 (2d Cir. 2011) (false arrest). Instead of pleading that the charges against her from the arrest have terminated in her favor, Schipke has pleaded that those charges are still pending. Doc. #1 at 24. Consequently, she can state a claim for neither malicious prosecution nor false arrest, so I will dismiss both of those claims.

Next, I will construe Schipke's claims about "inheritance hijacking" and property as claims under the Fifth and Fourteenth Amendments either for violations of the Takings Clause, or as deprivations of property in violation of the Fourteenth Amendment's Due Process Clause. Regardless of what rights Schipke seeks to vindicate here, her allegations are entirely conclusory and allege no facts that, if true, could support a claim for relief. Accordingly, I will dismiss those claims as to all Meriden defendants.

Schipke then alleges that Meriden police officers violated her rights under the ADA when they failed to accommodate her disabilities while arresting her. I will dismiss the ADA claims against the officers, because Schipke has sued the officers in their individual capacities. *See* Doc. #1 at 17. Title II of the ADA, which governs public programs, does not provide for individual capacity suits against state officials. *Garcia*, 280 F.3d at 107. To the extent that Schipke also seeks to assert official capacity claims against Cossette and the City of Meriden, her claims are also barred, because she only alleges in no more than conclusory terms that Cossette failed to train the officers and the city delegated power to Cossette. *See* Doc. #1 at 18.

Schipke otherwise accuses the Meriden police officers of trespassing on her property and of exercising excessive force against her when they arrested her, presumably in violation of her Fourth Amendment right to be free of unreasonable searches and seizures. I will dismiss any

Fourth Amendment claim premised on trespass, because "[t]respass alone does not qualify" as a search or seizure under the Fourth Amendment. *United States v. Jones*, 565 U.S. 400, 408 n.5 (2012). To the extent that Schipke asserts a claim for trespass under Connecticut tort law, I consider such a claim alongside other state law claims *infra*.

The Fourth Amendment does, however, prohibit the use of excessive force by police officers in searching or arresting a suspect. *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *Hemphill v. Schott*, 141 F.3d 412, 416–17 (2d Cir. 1998). To establish a Fourth Amendment excessive force claim, a plaintiff must show that the officer's use of force was "objectively unreasonable." *Graham*, 490 U.S. at 397. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable police officer on the scene, *id.* at 396, and this "requires consideration of the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Hemphill*, 141 F.3d at 417. Schipke's allegations include a list of severe injuries she claims Meriden police officers caused her, such as a fractured sternum, spinal damage, and bloodied knees. *See* Doc. #1 at 4, 33. Schipke, however, only refers to "numerous police officers," *id.* at 33, and apart from generic statements about having been "brutalized" and the police disregarding her request for disability accommodations, *id.* at 4, 32–33, does not allege which officers injured her, how any officer did so, or any of the other circumstances surrounding the alleged use of force. While Schipke may file an amended complaint that cures these factual deficiencies, she has not stated a plausible claim for relief against the officers at this time.

Because Schipke fails to state a claim at this time for the use of excessive force, she similarly cannot state claims against Cossette or the city premised on supervisory or municipal

liability for the same conduct. *See* Doc. #1 at 18. By the same token, without an allegation of an unconstitutional action that he could observe and prevent, Zurstadt cannot be alleged to have failed to intervene and stop the use of excessive force. *See Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016).

Finally, Schipke also appears to sue the City of Meriden for misspelling Marguerite's name on the Wall of Honor. Doc. #1 at 27–29. I construe her claim to be one that sounds in negligent or intentional infliction of emotional distress, which are Connecticut tort claims. As with the trespass claim, I consider these claims with the other state law claims in the complaint *infra*.

Like the claims against the Connecticut state defendants, the complaint is sufficiently vague as to any further claims against the Meriden defendants, including, possibly, a taking of the Goodwill Avenue home, *see* Doc. #1 at 10, such that the Meriden defendants do not have notice of the allegations against them. *See Salahuddin*, 861 F.2d at 42. I will therefore dismiss any such claims without prejudice.

### *State law claims*

Having dismissed the claims sounding in federal law, I now turn to Schipke's state law claims. These include claims against Meriden police officers for trespass, as well as against the City of Meriden for misspelling Marguerite's name on the Wall of Honor. In addition, Schipke's claims against several other defendants sound only in state law. Schipke accuses attorney Luby of embezzlement, exercising undue influence over Aunt Rose, and illegally selling the Goodwill Avenue home.[1] Doc. #1 at 9–10, 14–15. She accuses Daigle of embezzlement and neglect, *id.* at

---

[1] Schipke also accuses Luby of conspiring to deprive her of her constitutional rights. Doc. #1 at 34. But because Luby is not alleged to be a state actor, he cannot be sued for any constitutional tort. *See Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014).

9, 20–21, Connie Schipke of exercising undue influence, *id.* at 15, and Vega of trespassing on and illegally occupying the Goodwill Avenue home, *ibid.* All of these claims arise under state law. Federal courts of course may exercise diversity jurisdiction over state law claims involving an amount in controversy of more than $75,000 if no plaintiff and no defendant are citizens of the same state. *See* 28 U.S.C. § 1332; *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267 (1806) (Marshall, C.J.). Here, Schipke is a Connecticut citizen, *see* Doc. #1 at 12–13, as are several of the defendants. For instance, Schipke alleges that Vega lives at the Connecticut address she seeks to take possession over. *Id.* at 15. As such, there is no basis for diversity jurisdiction. And in light of my dismissal of all federal claims at the pleading stage, I decline to exercise supplemental jurisdiction over Schipke's state law claims. *See* 28 U.S.C. § 1367(c)(3); *see, e.g.*, *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 117–18 (2d Cir. 2013). I will therefore dismiss any remaining state law claims as to any defendants.

## CONCLUSION

For the reasons set forth above, all remaining defendants' motions to dismiss (Doc. # 32; Doc. #41; Doc. #43; Doc. #56; Doc. #58; Doc. #65; Doc. #70; Doc. #88) are GRANTED. Schipke's motion for a declaratory judgment (Doc. #71) is DENIED AS MOOT. This order of dismissal is without prejudice to Schipke's ability to file a motion to reopen along with an amended complaint within 30 days, by **February 6, 2019**, that cures the factual deficiencies identified in this order. Any amended complaint shall comply with Federal Rules of Civil Procedure 8(a) and 10(b), shall use numbered paragraphs to set out a short and plain description of Schipke's claims to relief, and to promote clarity, shall separate each cause of action or claim to relief into a separate count. Any amended complaint should recount facts in chronological order and be free from scandalous or irrelevant information. The Clerk of Court shall close the

case pending any motion to reopen.

It is so ordered.

Dated at New Haven this 7th day of January 2019.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge